# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CR-18-73-GF-BMM** |
| Plaintiff, | |
| vs. | **ORDER** |
| RONALD ALLEN JORDAN, | |
| Defendant, | |

Defendant Ronald Allen Jordan ("Mr. Jordan") moves the Court to dismiss the indictment pursuant to the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment. (Doc. 34). The Court conducted a hearing on this matter on April 18, 2018. (Doc. 54).

## BACKGROUND

J.G.B., a minor, reported to staff at her middle school in Browning, Montana that she had been sexually assaulted. (Docs. 35 at 3; 44 at 2). J.G.B. reported that the incident happened the night before when she had stayed at her friend J.J.'s home in Babb, Montana. *Id.* J.J. is also a minor. School officials informed law enforcement and Blackfeet Child Protection of this report. (Doc. 44 at 3). F.B.I. Special Agent Charles Corbett ("Agent Corbett") responded and interviewed J.G.B. that same day on April 25, 2018. (Docs. 35 at 3; 44 at 3).

1

J.G.B. informed Agent Corbett that both she and J.J. were sleeping together in a single bed. (Doc. 27 at 10). Mr. Jordan entered the room and climbed into the bed where J.G.B. and J.J. were sleeping. *Id.* at 4. J.G.B. told Agent Corbett that Mr. Jordan touched her butt and side, as well as her legs. *Id.* J.G.B. informed Agent Corbett that Mr. Jordan left the room, but returned and crawled back into bed. *Id.* at 5. J.G.B. claimed that Mr. Jordan began trying to touch her and kiss her neck. *Id.* J.G.B. stated that Mr. Jordan made her touch his penis and that Mr. Jordan put his finger in her vagina. *Id.* J.G.B. alleged further that Mr. Jordan laid on her right arm so that she could not move. (Doc. 35 at 5).

J.G.B. claims that Mr. Jordan got out of bed, left, and came back into the room and into the bed multiple times. (Doc. 44 at 4). J.G.B. reported that during this incident she was wearing Nike spandex shorts, a pink Nike shirt, pink underwear, and a black bra with hooks on the front. (Doc. 35 at 40). J.G.B. reported further that she had not taken a shower since the incident. (Doc. 27 at 5).

Agent Corbett interviewed Mr. Jordan later that same day. Mr. Jordan agreed that J.G.B. had stayed at this home the night before. (Doc. 36). Mr. Jordan admitted also that he had climbed into the bed with the two girls, but claims that it had been brief and that he did not return or harm J.G.B. *Id.* at 9. Agent Corbett interrogated Mr. Jordan for about an hour. Mr. Jordan agreed with Agent Corbett

that J.G.B. was an honest girl and that she would not lie. *Id.* Mr. Jordan continued to deny having assaulted J.G.B. *Id.* at 6.

Agent Corbett observed that Mr. Jordan's hands were a "little dirty." *Id.* at 14. Mr. Jordan acknowledged that he had not showered or cleaned up that day after having put in a full shift at his job. *Id.* at 13. Agent Corbett proposed taking "some swabs of [his] hands for DNA" and informed Mr. Jordan that this was "something that the FBI does all the time." *Id.* Agent Corbett asked permission to swab Mr. Jordan's hands. *Id.* Mr. Jordan consented. *Id.* Agent Corbett asked Mr. Jordan if he was worried about the laboratory finding J.G.B.'s DNA on his hands. *Id.* Mr. Jordan replied no and reiterated that he was willing to provide the swab. *Id.*

Agent Corbett failed to collect any physical evidence during his investigation. Mr. Jordan seeks to dismiss the Indictment in its entirety, alleging that Agent Corbett destroyed potentially exculpatory evidence due to his failure to preserve it. Mr. Jordan claims that Agent Corbett destroyed potentially exculpatory evidence when Agent Corbett failed to take, offer, or inform J.G.B. of a sexual assault examination. (Doc. 35). Mr. Jordan argues that Agent Corbett destroyed potentially exculpatory evidence when Agent Corbett failed to swab Mr. Jordan's hands for J.G.B.'s DNA. *Id.* Mr. Jordan further asserts that Agent Corbett should have collected the clothes that Mr. Jordan and J.G.B. had been

wearing, as well as other evidence related to the assault such as photographs of the room and the bed where the alleged assault had taken place. *Id.*

## LEGAL STANDARD

The Due Process Clause of the Fifth Amendment provides a criminal defendant with "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1985). The Supreme Court developed "what might be loosely called the area of constitutionally guaranteed access to evidence." *Id.* This access requires, at a minimum, the "delivery of exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id.* This evidence must possess both an exculpatory value "that was apparent before the evidence was destroyed" and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. Instances exist in which evidence is "obviously of such a substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *Unites State v. Agurs*, 427 U.S. 97, 110 (1976).

A defendant must demonstrate bad faith on behalf of law enforcement when alleging spoliation. Bad faith consists of "official animus" or "a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488-89. The "presence

4

or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993). A bad faith failure to collect potentially exculpatory evidence would violate due process. *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989). The Supreme Court has refused, however, to read the fundamental fairness requirement of the Due Process Clause "as imposing on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

## DISCUSSION

The line of cases following the Supreme Court's decisions in *Trombetta* and *Youngblood* follow two paths. One path discusses the government's alleged failure to "preserve" evidence already obtained. *See United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015); *see also United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013); *Cooper*, 983 F.2d 928. The other path discusses the government's alleged failure to "collect" potentially exculpatory evidence. *See Sadowski v. McCormick*, 785 F. Supp. 1417, 1421 (D. Mont. 1992), *aff'd*, 2 F.3d 1157 (9th Cir. 1993); *see also United States v. Martinez-Martinez*, 369 F.3d 1076 (9th Cir. 2004); *Miller*, 868 F.2d 1116. Bad faith by the government must exist to support a due process violation, however, with regard to either path.

The defendant in *Cooper* challenged the government's alleged failure to preserve already obtained exculpatory evidence. Law enforcement obtained a search warrant and seized suspicious equipment from the defendant's laboratory. *Cooper*, 983 F.2d at 931. The seized equipment's exculpatory value was repeatedly suggested to the government. *Id.* Specifically, the defendant's parole officer and the laboratory's landlord supported the defendant's claims of legitimate laboratory equipment. *Id.* Defense counsel requested the return of the equipment, but the government agents claimed that it was being held as evidence. *Id.* The equipment actually had been destroyed. *Id.*

The Ninth Circuit determined that the government had violated the defendant's Due Process rights. *Trombetta* illustrates that a defendant's right to due process stands violated "if the unavailable evidence possessed exculpatory value that was apparent" before destruction and possessed value so significant that "the defendant would be unable to obtain comparable evidence." *Id.* at 931 (internal quotations omitted). The Ninth Circuit explained also that *Youngblood* requires bad faith and that "the presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id.*

The Ninth Circuit determined that bad faith existed. The government understood the exculpatory value of the equipment from the repeated assertions of

defense counsel, the laboratory landlord, and the parole officer.  The government allowed the equipment to be destroyed despite this information.  The Ninth Circuit explained further that the defendant's due process rights had been violated when the government understood the exculpatory value of the evidence and the defendants could not obtain an item of evidence possessing comparable exculpatory value.  *Id.* at 932.

The defendant in *Miller* argued that the investigating officers' failure to collect a bloodstained jacket and failure to photograph the defendant's scratched arms violated his due process rights.  The investigating officer interviewed the victim the day after the alleged assault.  *Miller*, 868 F.2d at 1117.  The victim informed the investigating officer that she possessed the jacket that she had worn the previous night and that bloodstains could be found on the jacket.  *Id.*  The investigating officer failed to seize the jacket.  The defendant argued that the investigating officer deprived him of relevant, exculpatory evidence, and that the failure to collect the potentially exculpatory evidence arose from the investigating officer's bad faith.  *Id.*

The Ninth Circuit confirmed first that the fundamental fairness requirement of the Due Process Clause does not impose on the police an "undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution."  *Id.* 1120 (*citing Youngblood*,

488 U.S. at 58).  The requirement that "a defendant show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds" and confines it to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* (*citing Youngblood*, 488 U.S. at 58).  The police's failure to preserve evidence that is potentially exculpatory does not violate due process absent bad faith.  *Id.*  It makes sense, therefore, that "neither does the *good faith failure* to collect such evidence violate due process." *Id.* (emphasis added).

The defendant in *Miller* argued that bad faith existed.  The defendant alleged that the investigating officer harbored animosity toward the defendant because of his criminal record.  *Id.* at 1121.  This animosity, coupled with the fact that the investigating officer "tried to dissuade witnesses from testifying" while indicating that their testimony would prove fruitless, led the Ninth Circuit to conclude that a colorable claim of bad faith did exist.  *Id.*

Mr. Jordan argues similarly that the government violated his due process rights when the government failed to collect or preserve potentially exculpatory evidence.  Mr. Jordan argues further that bad faith exists.  He contends that Agent Corbett understood the exculpatory value of the evidence yet chose to collect no physical evidence relevant to the alleged crime.  Mr. Jordan believes that Agent Corbett should have undertaken the following actions: swabbed Mr. Jordan's hands

for J.G.B's DNA; offered a sexual assault exam to J.G.B.; collected clothing worn by both J.G.B. and Mr. Jordan; collected the bedding where the alleged incident occurred; taken photographs and measurements of the bed where the alleged incident occurred; and, taken photographs of Mr. Jordan on the day following the incident.  (Doc. 35 at 13).

Agent Corbett's decision to collect no physical evidence during his investigation, however unfortunate this decision may prove, does not rise to the bad faith standards set in either *Cooper* or *Miller*.  Mr. Jordan attempts to liken this case with *Cooper*, in that Mr. Jordan argues that Agent Corbett effectively destroyed potentially exculpatory evidence when Agent Corbett chose not to swab Mr. Jordan's hands while Mr. Jordan was in custody.  Mr. Jordan argues further that Agent Corbett destroyed potentially exculpatory evidence when he did not collect J.G.B.'s clothes, particularly J.G.B's spandex shorts and underwear, that J.G.B. had worn the night of the alleged incident.  Both items, as Mr. Jordan argues, possessed the potential to exonerate him from the crime pursuant to DNA testing.

The Government argues that there existed only a minimal possibility of DNA residing on Mr. Jordan's hands fifteen hours after the alleged incident despite Agent Corbett's threats to swab Mr. Jordan's hands during the interrogation. Agent Corbett claimed that he exercised his professional discretion when he chose

not to swab Mr. Jordan's hands. Agent Corbett explained that J.G.B. did not claim to have bled as a result of the alleged assault. Agent Corbett further explained that J.G.B. had not claimed that Mr. Jordan had ejaculated during the assault. Agent Corbett further explained that all parties agreed they had been in the same bed. Agent Corbett testified that he determined that a DNA examination of J.G.B's clothing would not have provided valuable evidence. (Doc. 44 at 18).

Agent Corbett's choice not to take the DNA swab differs from *Cooper*. The government agents in *Cooper* destroyed evidence that they allegedly had obtained and preserved. When defense counsel sought to reclaim the evidence, the government agents informed counsel that it was stored away when it, in fact, had been destroyed. Agent Corbett chose to end the interrogation and leave Mr. Jordan in custody without swabbing Mr. Jordan's hands for J.G.B.'s DNA. Agent Corbett never collected or preserved DNA samples. Agent Corbett similarly chose not to collect the clothes J.G.B. had worn the night of the alleged assault because he believed that the clothes would provide no evidence that would prove valuable to the case.

Unlike *Cooper*, where the agent proffered no sound explanation for having destroyed the materials from the lab, Agent Corbett alleges that he exercised his professional discretion not to obtain the DNA evidence. Similar to the Supreme Court's refusal to impose an absolute duty on law enforcement to obtain all

materially relevant evidence in *Youngblood*, the Court determines that Agent Corbett did not possess an absolute duty to collect the DNA evidence here.

Mr. Jordan argued that the actions of Agent Corbett in this case compare to the agent in *Miller* who failed to collect the bloodstained jacket. Agent Corbett's actions differ. Agent Corbett exercised his discretion when he chose not to collect J.G.B.'s clothes or take the DNA swabs of Mr. Jordan's hands. The agent in *Miller* offered no justification for his failure to collect the jacket. The agent knew that the jacket had blood on it. *Miller*, 868 F.2d at 1117. Agent Corbett knew that J.G.B.'s clothes or Mr. Jordan's hands *might* possess DNA. Moreover, bad faith existed in *Miller* where the defendant provided evidence of animosity by the investigating officer in the form of his statements to witnesses to discourage them from testifying. *Id.* at 1121. Mr. Jordan has not provided such evidence of bad faith by Agent Corbett here.

*Miller* provides "that a bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Id.* at 1120-21. The Ninth Circuit explained that bad faith could be shown "in those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* Agent Corbett reasonably exercised his discretion when he chose not to collect certain types of evidence.

Agent Corbett exercised this discretion when he chose not to suggest a sexual assault examination after J.G.B. had reported thoughts of suicide. Agent Corbett chose not to collect DNA samples of Mr. Jordan's hands and J.G.B.'s clothing. Agent Corbett similarly believed that photographs of the room, the bed, and of Mr. Jordan would provide no evidence relevant to his investigation. Agent Corbett appears to have exercised his professional discretion reasonably, with no evidence of bad faith. The Court finally notes that Mr. Jordan owns the home and the bed in which the alleged assault took place. Defense Counsel possesses access to the area and could take the necessary photo of the bedroom and bed, and any accompanying measurements.

The Court declines to dismiss the indictment against Mr. Jordan in the absence of bad faith on Agent Corbett's part. Mr. Jordan remains free, however, to explore all of these issues with Agent Corbett at trial. The jury ultimately will decide whether the failure to collect evidence by Agent Corbett gave rise to reasonable doubt. The Court will defer to the wisdom of the jury rather than dismiss the indictment without a demonstration of bad faith by Agent Corbett.

//

//

//

//

# **ORDER**

Accordingly, IT IS ORDERED that DEFENDANT's motion to dismiss the indictment (Doc. 34) is DENIED.

DATED this 24th day of April, 2019.

Brian Morris
United States District Court Judge